for an argument not to speak 15 minutes for 5, Mr. Paul Sobieta. Mr. Paul Sobieta for an argument not to speak 15 minutes for 5, Mr. Paul Sobieta. May it please the court, counsel, my name is Tom Paul and I represent Everest Stables, a business that is in Minnesota and owned by Jeffrey Nielsen and his family. And I'd like to thank you for allowing me to present today as to why they're entitled to a jury trial and why the court below erred in granting summary judgment. I have three matters that I'd like to focus our attention on today. The first is the Patientville claims. The second are claims under the November agreement. And the third is the claims under the Fourth Amendment complaint. Let me begin with talking about Patientville, which was the single most admittedly no single document is in existence that sets force and contemplates all of the terms and conditions and duties of Crestwood. But what we did submit to the court below were a number of agreements, correspondence, deposition testimony that reflects the course of dealings, the practices of the undertook for almost 12 years before it was no longer in their best interest to do so and they abdicated those duties. So this is the management claim? This is the management claim, correct. And essentially the court said that there were no definite or concrete terms and nothing in writing. And I submit to you that that is why I pled both an express contract, because you can have an express agreement, as well as implicit contract or an implied contract, which is where one or more of the terms are not stated and expressly agreed upon in a verbal or in a written sense of the word, but you look to the party's conduct. And that's why we submit whether it's an express contract or an implied in part contract. On the express side of things, what would you say is your best evidence for the express management agreement? What should we look at to help us there? I think there are a number of things, if I can, Your Honor. First of all, take a look at the contracts themselves. They're in document 159, I believe exhibits 5, 6, 7, and 9, and each of them reflect that Crestwood was doing the selling of these stallion seasons. Are you referring to the 98 agreements? You're saying looking at those? The 98, the patient bill contracts is what I'm talking about. That was one of their duties, to sell and promote those services, that is, a stallion services, stud fees. The second I would look to would be the solicitation letters. And those, I believe, are found at exhibits 10, 11, and 12 under document 159. And that's where Crestwood is promoting to the public, to mayor owners, come have your mayors be bred by patient bill. He's a stallion with this credential and this background. Please contact us. Nowhere in any of those documents can you find Everest Stables or Jeffrey Nielsen's contact numbers. The reason being... How do you get around your very own client saying Crestwood performed animal husbandry and cared for my horses while at the farm and had no part in my breeding decisions? And thank you, Your Honor, because that gets us to the animal husbandry. I believe that's in the animal husbandry letter. And that has nothing to do with patient bill. Patient bill is a stallion, and over on this side are a hundred or more mayors that some of them are being bred to patient bill, but those breeding decisions as to the brood mayors and what to do with a weanling and what to do with a yearling, those decisions are entirely separate from patient bill. And it is... What about the October 2, 1996 letter? It says, for this reason, a contract should not be approved or sent out without my approval. And two reasons or responses to that is, one is, absolutely, my client had the final right to say yes or no to a particular breeding that was going to be matched up with patient bill. That doesn't alter if a real estate agent is acting to sell your house. That doesn't mean you don't retain the right to say, yeah, I'll take that price as the principal or I'll ask for a higher price as the principal. It means that the agent still owes agency duties to go out and market and sell and promote the house just like it would be a stallion and the services to be provided by a stallion service contract. So I think we've also presented... The same protocol says all requests should be accompanied by mayor's pedigree, race record, produce, and last year's breeding history and sent to me. That is correct. That's not even just a basic approval on price. It seems like Nielsen's retaining the management side of things. In fact, what Nielsen's testimony is in the record is that would prompt a discussion between himself and Paul McLean Sr. as to whether that was suitable. Again, there were duties that were concomitant to Crestwood along with that protocol letter. It didn't simply say send it, I'll do it all by myself and I'll call you back and say yes or no. It prompted a dialogue and that is exactly the words used by Mr. Nielsen's deposition testimony and presented to the lower court that said it prompted a dialogue between the two of us as to whether that was a good match for both our purposes as well as the possible mayor's purposes. Because remember, one of the things that happens in a mating is there's going to be offspring running on a track someday. And both the owner of the stallion wants to make sure that that's appropriate and the mayor owner wants to make sure that that's a good match for a lot of different genetic reasons and fertility reasons and sale price reasons. So what I'm trying to explain to your honors is those kinds of dialogues and those kinds of discussions were what was presented to the court below. And what we contend was the error is she said that's not enough. And we submit to you that under the case law that we've cited, and I believe it's J.B. Robinson Jeweler's case, that that is enough to create a factual dispute such that summary judgment should not have been granted. Your theory of damages and injury on the management contract, whether implied or explicit, is that not enough promotion? That is absolutely correct, your honor. And we've also submitted, and it's part of the record, that the diminution in patient bill's value from that to... How do you spell patient bill, P-E-T-I-O, and who was in charge of that? You know what, I'm told that it's a city outside of Port-au-Prince in Haiti. I see, and that's how they pronounce it. It is, and... All right, not exactly material. That's okay, that's fine, your honor. It is an interesting site, and all of these horses' names usually have a story behind them. So we submit the district court erred in ignoring that evidence in that course of dealings and basically acting as the trier of fact when, in fact, that should have been something that was submitted to the jury in a jury trial setting. We believe that there were a number of errors. For example, the lower court erred when she said that we presented no evidence of marketing efforts that predated that magical moment in February of 2005, and that's just flat wrong. Exhibit 11 and 12, docket number 159, are two such marketing efforts from Crestwood to prospective mare owners that we didn't see any other such evidence afterward. And I would like to submit that we did present Mr. Nielsen's testimony in which he said, they never told me that they never had a dedicated sales and marketing team until discovery unfolded in this case. And while I understand that that may be self-serving, and may have been viewed by the lower court below as self-serving, the fact is, under the law of this circuit, just because a plaintiff articulates either in deposition or affidavit testimony something that is self-serving does not mean it is no evidence. And the lower court said we presented no evidence that they had not taken efforts after February of 2005. I'm sure there's an easy answer to this, but there was no statute of frauds arguments in this? There was. Whether there had to be a writing, and why is that? You know, I can't speak as to why they didn't raise it. Does Kentucky law just say, well, what, this was going to be performed in less than a year? It would have been probably capable of being performed within less than a year. It also didn't necessarily go to a personal services contract, which might give rise to an additional statute of frauds type argument. But I don't know. It was never part of the case. Thank you. So we submit that the lower court erred also in not finding that there was a trust arrangement or a fiduciary arrangement vis-a-vis Patientville. And let me explain why that was so. Because when Mr. Nielsen was out possibly finding other stallion farms in which he would bring Patientville, one of the things that, and it's part of the record, he was seeking was someone in whom he could place his confidence and trust. And Mr. McLean, the proprietor of Crestwood Farms, vigorously and vociferously advocated that they were a place in whom Mr. Nielsen could place his trust and, in particular, place his interest above their own. And that's at Mr. Nielsen's deposition testimony. Again, Document 159, Exhibit 3, Page 82. Those words... I don't get fiduciary duty claims to juries because one party says, I thought of the fellow on the other side as a fiduciary. And if it was a purely subjective, and I believe the court... What's your best evidence? I mean, trusting someone when you have a deal is true in lots of settings. That doesn't mean the deal's not arm's length. It absolutely doesn't. But the three-prong test in In Re Sally actually establishes when the parties had a relationship in advance that was of a fiduciary nature. In this instance, Mr. McLean had not only known but agreed to act as the agent for Mr. Nielsen under his revocable trust. I don't know. Maybe there's more mileage to this claim that I'm appreciating. But it seems to me very funny because this claim goes to the exact same problem of the management contract, right? I mean, it's the same set of damages. If you win under the fiduciary duty, you get the same damages you would have gotten under the management claim, right? They're similar. I'll agree with you. The damages are similar. The claims are slightly different. What I'm struggling with is if there's not an express or implied agreement to manage this horse, and you lose on that claim, I'm just really struggling with how you can get to the same. You can say, well, we're going to do all this through fiduciary duties. That just really is bizarre to me where the parties have nothing in writing or even implied from the contracts they did have. So just assume for the sake of argument you lose that claim. I just can't imagine how you'd have enough evidence to win a fiduciary duty claim. I think I see your point, and I have to agree that if you uphold the court's dismissal or the grant of summary judgment on the breach of contract, then probably by definition the breach of fiduciary duty is gone too. That's kind of what I'm wondering. We should really focus on the management contract claim. I would say that the management contract has fiduciary-like items. I'm sorry I didn't get to the second and third points. I see my point is up. Does the court have any other questions that you would permit me to answer? I'm somewhat confused on the facts. Which horse was withdrawn from the auction based on a minimum price? Yes, we differ in our terminology. It's the filly that was out of Stormcat slash Island Fashion, and it was in the September 2009 sale. That horse is one of two horses that did not get transferred in name to Crestwood under the November agreement and thus remained Everest property. When it was in the ring, we had, Mr. Nielsen and Everest, had someone submit bids in an effort to protect the horse's value. At the end of the day, we or our agent was the highest bidder, and that's called a reserve not attained, RNA bid. In other words, no money flows into the auction house, and certainly no money flows back out. We submit that that horse was not sold under the terms of the agreement, and therefore it's our position that we had the right to do so, and moreover, under the Keeneland rules, we had the right to do so. When the agreement referred to Island Fashion Stormcat filly. Island Fashion and her filly, that's the filly? That is correct. Island Fashion was sold in January of 2009, and that's a separate breach that we've addressed in our papers. Then nine months later in September of 2009, one of her fillies was RNA'd, not sold. Part of your argument is that you had a long history separate and apart from this last agreement, under which you would be able to retain some of the horses if you thought that it wasn't enough. Even Mr. McClain testified that the process by which my client and he would protect the value of horses in the ring for any one of a number of circumstances. Why when the RNA was submitted did you not disclose this to the other side? It was disclosed in the sense that they knew... After it was not sold? After it was... Is there sitting there marketing... Because if the horse had gone to a price that was acceptable to Everest, the sale would have gone through. I get that. I'm making the point. Why was Crestwood not told about the RNA? That's what seems a little duplicitous. At that point, the parties had fractured their relationship such that we had a separate or different agent acting on our behalf at that particular sale. But, I mean, it's Crestwood's the one who's responsible for this, and it's Crestwood's commission at stake. And you think the fact that they didn't like each other justifies not telling them what they were doing. And, again, the course of dealings that Judge White has pointed out would have been they would have gotten their board paid for, which was, in effect, the risk of not having this horse sold. Where Crestwood was being rewarded, if you will, was they were getting their board expenses repaid through this commission, as Your Honor has pointed it out. If they were deprived of that commission, they still had the avenue, as had happened in the prior dealings between these parties, of you, of course, get your board and expenses paid for. What would the difference be between the $200,000-plus that they kept as the commission and had they gone this other route? What would they have collected? On average, each month... Tell me, how much is left? Probably around $50,000 to $60,000 they would have gotten paid, not the $219,000. I see. And that's part of the Keeneland rules? No, that's the parties' course of dealings. Okay, but the Keeneland rules say nothing about it. The Keeneland rules only say that the principal or the agent must act in the principal's best interest. That's the, if you will, the agency rules that govern. And then with Island Fashion, you're claiming that before the auction, you wanted to set an R&A and they would let you? That is correct, and we actually instructed, and there's record evidence that we instructed them during the ring, the horses in the ring, bid, bid on that horse, protect the value to which we were denied that opportunity. I think we've got your argument. We'll give you a rebuttal. We'll hear from the other side. Very good. Thank you. Thank you, Your Honors, and may it please the Court, Mr. Paul. I'm going to start sort of at the end with the November agreement because that's just what was hit most recently, and I want to address this statement about the course of dealing because there's something fundamental that's missing here. The parties had a 15-year course of dealing on how they would take horses that they boarded to a Keeneland sale, and then in November they signed a contract that completely changed everything they'd ever done in the past. This is a contract that was proposed undisputed by Mr. Nielsen. He tried to actually take some of these horses to another person to get rid of them, and then he decided he wanted to get rid of them through Crestwood. He had his attorney draft a contract. He had his business advisor, Tim Nelson, get involved and draft the contract as well, and Crestwood had attorneys draft the contract. So you have an arm's-length negotiation between two parties, drafting a contract for the disposition of 144 different horses. Is this the 2008 agreement? This is the 2008 agreement, the November 2008 agreement, and I start there because the Island Fashioned Filly, out of Island Fashioned, the female horse, by Stormcat, the male. And I apologize that we sort of went backwards on that. So that horse was one of 144 different horses. This wasn't take one horse at a time, see if you can sell it, see what happens. It was from this day forward you take control of every one of our horses. You pay all boarding, all costs, all veterinary bills, all fees to put the horses in the sales, and you sell them over a period of time staggered out as we've laid out in this agreement. And this horse happened to be the most valuable of those horses. And so to say that we would have received a commission on this horse, I mean you're looking at disposing of 144 horses. On many horses you're going to take a loss. You take a hit on that. Tell me the point you're making. Are you making a point about the filly sale, or are you using the 2008 agreement as a contrast to the management contract? Oh, no, I'm sorry, Your Honor. I'm making a point about the filly sale. Okay. And that is there's a suggestion that we benefited greatly from this filly sale because the commission on that particular filly would have been much less under the prior course of dealing. But we weren't operating under the prior course of dealing. We were operating under a new contract that we negotiated through both sides' attorneys. What about the new contract prohibited them from secretly placing an RNA on it? Paragraph 4 of the new contract prohibited it, Your Honor. Paragraph 4. Okay, go ahead. And if I will, I'll pull that up. And this is the same paragraph that the court relied upon. And it says, Crestwood shall consign for sale and shall offer for sale and sell at recognized 2009 Kentucky public auctions as mutually agreed upon the following horses. Shall consign for sale and shall offer for sale and sell. Okay. There is no reserve set in this contract. It said we shall take the horses and we shall sell them. And we've signed this court to a You're just making Is the point you're making now, forget RNAs for a second, you're saying you get to sell them at whatever price you want as long as it's good faith and fair dealing. Unfortunately, actually, we don't set the price. The market at the auction sets the price. No, no, I mean, okay, same statement. Yes, Your Honor. You get to take them to auction and you try to sell them as long as you're behaving in good faith. They, Everest has no right to agree to whether that sale price is good. Absolutely. That's the exact point we're making. That is what the contract says. That's what they agreed to. Without that, we take this huge risk. We take on all the costs of boarding 144 horses. And Everest with every single horse could say, never mind, don't sell it. You guys just keep our horses for free. Add infinitum, do whatever you want. I mean, there's no unilateral or there's no bilateral agreement. Do you have a case that explains how incoherent that is in the way horse breeding works? In other words, some case that says, you know, no one, you would never do this. I mean, in other words, if you completely take control of the horses, you board them, you have all their expenses, of course you sell them on your own terms through auctions and the other things. No, Your Honor, I certainly don't have that case. I don't know that it's come up before. I can't say it hasn't. All I can say is the contract says you have to sell the horse, not just you can sell, you must sell. The Kentucky Supreme Court has said it's a word of command. When parties agree you shall do something, you shall do it, not maybe. I thought the underlying point that you were going to make, and so check me if I'm right or wrong. Certainly, Your Honor. That the 2008 sales agreement sets forth a whole new relationship between the parties. So you can't measure one party or the other's performance under that contract by virtue of the prior course of dealings. That is exactly what I'm saying. Prior course of dealings were under a different arrangement. Yes. For many, many years it was completely different. Under the 2008 sales agreement then, would they have still received their board on these horses had the money not been generated at a sale to pay the board? No. There was no provision whatsoever. They couldn't then just simply bill Everett for the cost of caring for these horses because they'd been transferred to Crestwood and it became their responsibility. That's exactly right. This is an after-the-fact fiction that's brought forth by Mr. Nielsen to say, well, we would have just paid you your board, you would have been fine. Now, I will say that the title to this horse, to be fair, was not transferred to Crestwood. There were two horses and the title was not transferred. But the obligation to sell was no different for those two horses than every other horse under the agreement. The only difference between the transfer of title is that if the horse went through the ring and nobody bid on it, it would have gone back to Everest instead of going back to Crestwood. But that did not mean that Everest could stop the bidding. As to the filly, you had the same duties in terms of boarding and all those other expenses? Yes. All those duties were the exact same with the filly and everyone else. There is not a provision in this contract that suggests that if the horse doesn't sell or if Everest comes in and says, no, we're not going to let it sell, that then you can get your board and your fees back for this or any other horse. And they were all, again, done together. So this is a block of horses. This is not a horse but 144 horses. And in this give and take, they were even split up. Okay, we'll get 25% commission on these horses, 50% commission on these horses. These we can sell privately. We won't even run them through the sale because they're not worth the cost of a sale. I mean, $750 a horse just to get it in the ring. And there were some that we decided wouldn't even be put through the ring, and that's in the contract. So this is a six-page agreement that mandates the sale of the horse. And the Kentucky law that I can cite you to, Your Honor. Given that Crestwood has this ongoing expense, why does the contract say Crestwood can't set reserves? What's the theory there? Because, I mean, all they're getting is commission. And, of course, once it's sold, they're freeing themselves of the ongoing expense of boarding the horse. So I'm just trying to figure out the business rationale for that. Because Crestwood's the party at the auction doing the sale. It is inconceivable that a party, the Everest, would send somebody else to the sale and undo it. I mean, the very purpose of the contract is to have the sale occur. That's why the contract was entered into. I'm just trying to figure out why one puts in the contract that Crestwood can't set an R&A. To prohibit Crestwood from bidding on the horses and stopping the sale. Because when it was entered into, Mr. Nielsen was insisting he wanted every horse sold. This fiction that's come forward of, oh, I want to protect the horses. Oh, I want to set reserves. This is after the fact. What happens is Crestwood makes more money at the sale than Mr. Nielsen wanted them to make. He decides he didn't like this deal and wants to undo it all. And now we're here where he's saying, oh, they wouldn't do this, they wouldn't do that. Ignoring the contract that he signed that he negotiated through his counsel that insisted this is how you must do it. And if I may, I just want to bring up the answer to the question that that way Nielsen is protected. That the horse gets sold now and that sale isn't delayed because of the establishment of an R&A by Crestwood. Because he's trying to get out of the business. He wants to liquidate these horses. I think that's exactly what he was doing. Now, I wasn't in his mind. I mean, I don't know why he did everything he did. It's just so strange, though, because Crestwood has the incentive to sell them, too, because it's paying the expenses of boarding. It does have the incentive. That's why it was so upsetting when he secretly sent someone to the sale and undoes the very thing that they agreed to do on the single most valuable horse. That's essentially, that's the spread on the contract. That's where Crestwood had an opportunity to actually make a profit. There's all these boarding fees that would have been paid. There's all this stuff that would have happened under the old agreement. And here's the horse that's going to make a difference. And he just takes it out from under the noses. The contract doesn't allow that. And as to Kentucky law, you know, the implied covenant of good faith and fair dealing, I think, is what gets into this. When parties negotiate that they're going to do something, in this case, that Crestwood's going to sell this horse, the other side can't deprive them of the benefit of the bargain by doing something to undo their opportunity. You cannot go forward and say, well, we'll just undo this sale. We're going to stop you from being able to sell it. And now you don't get any commission because we stopped you from selling it. He retained ownership of that horse and the other horse. He retained ownership, legal title to the horse, risk of loss. If the horse were to die and the insurance policy were to cover it, he would have gotten the risk. But he did not retain any control and he subjected the horse to this contract. He said, you take it with all my other horses. You board them. You pay for it. You run it through the sale and you get this commission. But isn't it at least a question whether a lot of times the horses are not sold because the owner decides it's not enough money, right? Yes. Okay. So where in the agreement does he give up the right to make that decision in a good faith, commercially reasonable fashion that, no, this horse is simply worth much more than that? And so we're not going to sell it today. If your question is to where he gives up the right, he gives it up in two places in the contract. At the beginning of Paragraph 4 where it says, Crestwood shall consign for sale and shall offer for sale and sell at recognized 2009 Kentucky Public Auctions. And at the end of the paragraph, I'm sorry, it says, as mutually agreed and determined between Everest and Crestwood, the 41 third-bred Wheeling horse in Exhibit 5. Now let me, because there has been some hay about that, about the as mutually agreed, and the position now is that that as mutually agreed is an agreement as to the sale. If you'll compare the beginning of that paragraph to the beginning of Paragraph 3, the parties here to agree that Crestwood shall consign for sale and shall offer for sale and shall sell at the Keeneland January 2009 mix sale, the following horses. The difference between those two paragraphs is that one calls for a specific sale, the January 2009 mix sale. The second one calls for at a recognized Kentucky 2009 Public Auction as mutually agreed and determined by the parties. There's four sales that these horses could have been sold at. Keeneland February 2009, you're going to have Fasig-Tipton is the next, I guess Keeneland's January, Fasig-Tipton the next sale. Then in July, another Fasig-Tipton. In September, another Keeneland. And then isn't there, I don't. And let me finish because. There's further language, right? There's further language. At the end of that paragraph, any other horses proposed to be removed from said sale shall only be by mutual written agreement of Everest and Crestwood. And that's the end of Paragraph 4. Isn't there a provision regarding the manner of sale? Best efforts? You're talking about the contract that says the duties. It says Crestwood shall exercise all commercially reasonable efforts with the utmost good faith for and on behalf of both Crestwood and Everest to properly prepare the subject horses for sale and to market offer for sale and to sell the subject horses. Either public auction or in private sales, et cetera. Is that the provision you're referring to? Yeah, I mean, it says that we shall use good faith and commercially reasonable efforts to sell for the benefit of both parties these horses. There's nothing in there that says, hey, by the way, Everest can undo it. And I go back to the language at the end of Paragraph 4. What if it's not commercially reasonable to sell that horse at that price? If Everest had come forth with some evidence that it was not commercially reasonable to sell that horse at that price, we might be having a different discussion. But there's been absolutely no evidence offered on the record of that fact. On the Philly, the commission was 25 percent on the Philly. I believe that's correct, Your Honor. And you'll notice that the horses are broken into Group 1, Group 2, Exhibit A, B, C horses. And there were different commissions set for different horses, taking into consideration the value of the different horses, et cetera. So, I mean, this is not a contract that just happened as they claim the management agreement just happened. Ah, you know, we get together. When it came time to actually do business, they knew how to do it. And Nielsen got an attorney, or Everest got an attorney, and Crestwood Farm got an attorney, and they negotiated this contract out. Can you respond to something your friend on the other side said? So now I'm going back to the management contract claim. Yes, Your Honor. So we talked about the protocol. He used deposition testimony to support this claim, whether expressed or implied. And then he said there was a series of other contracts that supported the claim. Do you know what he was referring to when he said that? I think I do, and I strongly disagree with the characterization. Okay, well, just go ahead. Respond to that. Sure. I think what he's talking about is the stallion season agreements that would be signed by Crestwood when someone brought a horse in and said we want to breed this mare to Patienville, and Crestwood would then follow the protocol and get Nielsen's permission to breed the horse. Yes, it's a good mare. No, it's not. And then they would sign the contract that says, you know, on behalf of Everest Stables, you guys get to breed this mare. And that is within exactly what, you know, it said in the protocol letter and exactly what we've said, which is those animal husbandry services. I mean, the horse stood at Crestwood. I mean, it was there. So while they weren't the manager of the horse, they didn't set the stud fee, they didn't make the mare selections that ultimately determined the value of the horse, they were there. So when people came, they paid money, they passed it out. I think Nielsen described that in his animal husbandry letter as administrative services. And those are essentially attendant to having the horse physically at the farm. So someone comes and they sign the contract on behalf, as instructed by Mr. Nielsen, yes, you can breed the horse. Did all of those contracts actually prove there wasn't a management agreement? Because the separate contracts were done for each mare. I don't think they do one way or the other. I think it's like when you go to a store and you buy something and you sign a piece of paper that says you're buying it. I mean, it's a receipt essentially. I mean, it's a little more than that, so I guess I'm being a little flippant. But it is a – every horse that has a stallion or every season that's sold has a contract like that. That's standard in the horse industry. Could you testify that you were managing the – Peschenbill's promotion as a stud and marketing him, that that was your responsibility? No. You'll find no testimony whatsoever of that kind from us. Now, we did – from our clients. I mean, we've never testified to that. I didn't say that. I'm sorry. You didn't testify to that. Mr. Nielsen asserts that we were marketing it, although he doesn't offer any evidence of that. He just – Well, evidence is what – he claims that McLean undertook that, right? Yeah. I mean, he claims it. Yes, absolutely. But that – then that's a question of fact. If he says that under oath and there's no written contract and there isn't, then why isn't that a question of fact? Because to have a contract, you've got to show some definition of what that term is. He just says they were marketing him. Well, what were they doing? Were they bound by a certain advertising budget? Did they have to contact 50 people a day? Were they selling? Is the deposition testimony that he says we had a management agreement? His deposition testimony is I thought we had a sales team in place and they were out there selling the horse like crazy. I have no idea why he thought that, but that's what he says. Well, he does say why he thought it, because he had an offer, right, to somebody who was going to buy the horse, and he claims that press would, because they didn't want to lose all of that money, said, no, no, we'll – he's worth more than that in stud fees and we're going to make sure that that happens. I mean, that's his testimony, yes. So why isn't that a question of fact? Because that does not create a contract to manage the horse. Now, I will back up and say that in this regard, he's sort of backing down, right? At first it was management of a stallion, and now it's just selling seasons of a stallion. And so if the question is why isn't there an issue of fact as to whether or not Cresswood agreed to sell seasons of the stallion, I would say it turns to the question of how would you define that obligation contractually, and how would you define a breach? What was it that they were supposed to do to sell seasons? What exactly? Because selling seasons in and of itself, what does that mean? Do they, like I said, have to contact a certain number of people? Did they have to sell a certain quota each year? How would you measure the breach of that? What are you saying? Beforehand people would just come in and say we want sessions, and then you would forward him the information? What I'll say is the only evidence of record is that we did everything the same throughout the period of time. And that kind of goes to more of a breach and damages issue. Period of time going up to 1998? Period of time going from 1998 to 2000. I think it was actually after 08 that he finally moved the horse. It's not that he moved it. In 05 when he claims that offer was made and everything went to pot, the horse actually stayed at Crestwood for three more years or four years. It's not like he just, you know, you guys aren't doing what I, you told me you were going to do. I'm going to take the horse. He actually kept the horse there. I must have been misunderstanding the questioning. I thought the questions you were asking were questions about an oral contract pre the 08 agreement. Yes, I believe so. Okay. So in 96 the horse came to Crestwood. And the horse stayed at Crestwood through about 08. And in 05 is when Mr. Nielsen says he got this offer for $6.5 million to buy the horse and was talked out of it by the McLeans. I mean, it is. It's self-serving testimony by him. And I understand that it creates something. And I'm not saying it creates nothing. But the question is, does that create evidence of a contract? And in order to have a contract, an oral contract like that, there must be at least enough by which this court can measure both the performance and damages in the event of a breach. And I know I'm over my time, but if I could answer that damages question because I think it's significant, what are they saying the damages are for not selling? And by the way, what is the not sales? I mean, we don't know what they're saying. You know, we didn't contact anyone. I mean, clearly seasons were still sold, so some sales still happened. There's a standard of whatever you did essentially is not enough. And that's not definite enough to create a contract. Well, it just has to be good enough for me to say it's good enough. There isn't an industry standard that basically suggests what somebody that's marketing seasons does? Not that they've put the record. You listed in a horse magazine or I don't know. They've not put any evidence of record. On the other hand, we did have two experts who we had testify on our behalf that said everything we did was appropriate for what we were doing. But turning just to the damages on that contract, because what they're saying is this horse was worth $6.5 million one day and it was worth $100,000 some five years later. What's the evidence that anything we did caused that? Because here's what I know for sure. There's two experts that say the reason this horse lost value is because it was overpriced at its stud fee compared to the performance of the horses that it sired. So in the years when it was supporting a $15,000 mating stud fee, this horse in the previous years had six and seven stakes winners, which is the gold standard for your horses in the industry. Who set the stud fee? Mr. Nielsen set the stud fee, and there's no dispute about that in the evidence. In the years after that, 2004 was his last good performing year. So in 2005, he had high sales because you perform well in 2004, and then that affects your 2005 sales. In 2005, he drops down to three stakes winners, and Mr. Rosenberg and Mr. Berry both testified about this, and they're attached in the record. And then in 2005-2003, 2006-2002, 2007-2002, his performance tanks. Is it the performance or the number of offspring? I mean, the number was the same. It's just whether it was outside or inside. I guess at some point the number came down, but we're looking at offspring several years back. So it would be the 05 offspring that were performing in 07. So, I mean, that can't be attributed to the lack of sales. What happens is the performance tank. And our expert witnesses said unequivocally this stud fee at $15,000 was ridiculously high for this performance. When you go from five or six and seven graded stakes to three and two, you can't stay at a $15,000 stud fee. And he's offered no expert evidence to the contrary. Thank you. I think we understand your argument. We appreciate it. And, Mr. Paul, if you have some rebuttal. Mr. Paul, just one almost factual thing I just want to make sure I'm grasping. On their claim where they're getting this claim for the commission because their argument is, you know, in studying this RNA, you didn't act in good faith and fair dealing. I take it you would agree that had that filly been sold at $900,000, we're fine. Because you set the RNA at $900,000 and that would have been okay. If it had achieved the reserve price or above, then, yes, they would have. So the point is you wouldn't – no one would be griping at a $900,000 sales price. I think the last bid that we placed put it at, I believe, $900,000. We actually had a reserve number that was higher than that in mind for the value, partly due to the discussions that we – Well, I mean, I'm just trying to – I'm going to use all your rebuttal time if you don't help me with this. I'm trying. I thought there was a sale offer at $875,000. It didn't go through because the RNA was $900,000. That's what I thought the facts were. Am I wrong about that? You are slightly, ever so slightly, and it just has to do with the auction process. Somebody live bid at $875,000. We next bid at $900,000. Nobody knows that it's not a live bid or not. Nobody goes above $900,000. We're the owner as an RNA bid. It's not a money-changing hands going into the auction house. Okay, so what I'm trying to figure out is what would have been a price that you would have been satisfied with. $925,000? Is that what you're trying to say? And the point is it's somewhere, and I can't give you the answer to that because we never got to that point. You said it. You said you set – We had a price in mind, and I don't know that it's in the record. Okay, well, here's the point I'm making, which I don't think anything what you're saying makes a difference to the point I'm making. The point I thought – I was trying to figure out whether this claim was a little exaggerated in its significance to the parties monetarily. My way of thinking about it would have been $875,000 price. It seems like your client would have been satisfied with $900,000. All we're really talking about is $25,000. They get to keep 25% of it anyway, so this whole claim is your client's really upset about losing $19,000.  Your clients are spending a lot of money on this. And admittedly, I can see that point now that I understand where you were going with it. And if that was the only beef, I'm guessing we wouldn't be not only in the Sixth Circuit but even in the district court. But there were a number of other issues, and obviously that was another issue or another claim. And if I may, this is an important topic because I believe Judge McKeague pointed out, well, the course of dealings in the past really doesn't come into play in this circumstance because we have a new agreement. The problem is – and we submitted an affidavit. Again, it's evidence. It's Document 154. Mr. Nielsen put specifically that Paragraph 7, as Judge White has picked up on, prohibited Crestwood from RNA-ing, but it did not prohibit Everest from doing so. It did not prohibit Everest from protecting its own value. And where a contract is silent – That begs the question. That assumes you still had that right. You don't put in Everest's right to do RNAs if Everest had given up its rights. I mean, it begs the question. And we submit we never gave that up. In other words, that goes back to the expressness. That's the question. But if you say you never gave it up, so it wasn't inconsistent to exercise it, it seems to be inconsistent with a repeated reference to Crestwood shall sell. By mutual agreement, as mutually agreed, and that's at the very end of that paragraph of Number 4, we didn't agree at the price that it was going to be sold at. We would have agreed had it achieved a higher price where both parties would have been satisfied. But Crestwood wanted to dump it at whatever price. We wanted to make sure that it protected its value. In other words, your argument, removed from said sale only by mutual written agreement, that act in the horse industry of removing from sale isn't limited to just not putting it in the ring. It also applies to it being in the ring and then you RNA in it. It's a frequent practice in this industry to buy back or RNA bid on one's own horses. But if it can only be removed from the sale by mutual agreement and RNAing a horse constitutes a removal from sale, where did you have the mutual agreement from Crestwood in connection with the very language you're relying upon when you didn't tell them about it and they didn't agree to it? I see that point. We didn't reach agreement, but the point is the horse was going to be sold if mutually agreed. But wait a minute. Judge White asked you a question and you say yes, but only by mutual agreement. Then we read the mutual agreement paragraph and you didn't actually reach mutual agreement on what you did. So how do you win on that? The point is on this issue where there is silence on what rights we did have, A, the Kentucky law applies. Let me see if I get this right. So you get to RNA. That constitutes removing from the sale, but you're not subject to mutual agreement. That's what you have to convince us on that particular claim. You reserve the right to do it because it doesn't say you can't, and you weren't subject to the very language of the contract that removing requires mutual agreement for that type of a removal. I believe that. I think that is correct, Your Honor. Where do I look to find some sort of explanation or verification or justification as to why, assuming you can do it, I'll concede for the question you can do it, why isn't your doing it subject to mutual consent? I would say that if the contract is either ambiguous or silent on my rights as to that, now you have to look to the party's course of dealings. But, Mr. Paul, I just don't think you're reading it the right way. I think the as mutually agreed and determined is about the auction sales, where and when. And we submit that's – we understand that that's what the lower court also found, and we submit those are not – you have eviscerated a protection. Okay, it's always a good idea to hear where the decision-maker is coming from. So here's my point about that. Now try to read the contract the way you're reading it. It says, Crestwood shall consign for sale, shall offer for sale, and sell. Your theory is all three of those events, all three of those choices by Crestwood, it can't do without Everest at every single turn. The horse it decides, the horses we're going to decide to send at this auction, the price, every single thing, I mean, it can never get done. And they're the ones that have to continue to board them and pay all those expenses? Why is that the case, Your Honor? We owned upwards of $5 million worth of horses, and probably more valuable than that. That's just the sale that they actually went. $5 million worth of horses that we put in the hands. Very expensive to keep up. Absolutely. At, on average, $100,000 a month. On the other hand, they've gotten $800,000 worth of profit when they would have otherwise only gotten $60,000 worth of profit. My point in answering this, Your Honor, is they undertook these obligations in a quasi, if not absolute, fiduciary capacity. They had the obligation under Mr. Nielsen's request and under his prior trust arrangement to work with Everest. That was in all aspects, whether it was in identification of the sale, protection of the pricing or the RNA pricing, what kind of care. Now, part of the reason why the title got transferred to Crestwood was Mr. Nielsen thought he was going to die and thankfully did not. And that would have given Crestwood, who were they going to talk to? Well, there was no other Everest person other than Mr. Nielsen. But until he passed, that's who they had to talk to. Any other questions, Your Honors? Did the filly eventually sell? She has sold, I believe. I don't know the price. If that's important to you, I could supplement, but I don't believe. She didn't sell at that September sale. I believe it was subsequent to that. Is it more or less? I really don't know the answer. I know that that's probably important, just reality check. All right, well, listen, thanks to both of you for your helpful briefs and oral arguments and for answering our questions. Thank you. Appreciate it. The case will be submitted.